**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| THOMAS RIPPLE,<br><br>                             Plaintiff,<br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>                             Defendant. | Case No. 17-CV-469-JPS<br><br>**ORDER** |

**1.     INTRODUCTION**

On March 31, 2017, the plaintiff, Thomas Ripple ("Ripple"), filed this lawsuit seeking a declaration as to the enforceability of the terms of his employment agreements with the defendant, Zurich American Insurance Company ("Zurich").[1] (Docket #1). Ripple claims that the agreements he executed pursuant to his employment at Zurich are void and unenforceable. *See generally id.*[2] Zurich, for its part, denies the allegations in Ripple's complaint and brings several counterclaims against him for breach of contract, breach of fiduciary duty and duty of loyalty,

---

[1] According to the defendant, "Zurich Financial Services Group," was incorrectly named as the defendant, as "it is not a separate corporate entity but rather a trade name that is no longer in use." (Docket #13 at 1). The proper defendant is Zurich American Insurance Company. *Id.* Ripple has not expressed disagreement. The Court has updated the defendant's name in the case caption.

[2] Ripple has invoked this Court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), which the Court deems proper because it is uncontested that the citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Docket #1 at 2).

misappropriation of trade secrets, and conversion. (Docket #7). Zurich's counterclaims are based on Ripple's alleged misconduct following the termination of his employment with Zurich, including his operation of a competing business, RBI, LLC ("RBI"), which Zurich claims is unfairly competing in the same territory previously serviced by Ripple on Zurich's behalf.

On April 26, 2017, Zurich filed a motion for a temporary restraining order and a preliminary injunction. (Docket #8). That motion sets forth the same core allegations as appear in Zurich's counterclaims: that Ripple continues to breach the non-solicitation and confidentiality terms of his former employment contract and that such activities are irreparably harming Zurich's reputation and business relationships. (*See generally* Docket #9). In light of these harms, Zurich asks the Court to grant it a temporary restraining order and preliminary injunction pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. (Docket #8, #9). Specifically, Zurich asks this Court to enter an order enjoining "Ripple, and all parties in active concert or participation with him, . . . from using or disclosing any of Zurich's confidential, proprietary and/or trade secret information" and from "engaging in or participating in any employment or activity, insomuch as such activity is directed to or designed to solicit or divert any of Zurich's customers or potential customers that Ripple contacted, targeted or serviced, or about which he had access to confidential information while in Zurich's employ." (Docket #9-1). Zurich further asks the Court to direct Ripple, and all parties in concert with him, to return to Zurich any files, devices, or documents that contain its confidential information. *Id.*

Zurich's motion is fully briefed and ripe for adjudication. (Docket #8, #9, #16, #17, #22). For the reasons stated herein, the Court concludes that a preliminary injunction is inappropriate and will, therefore, deny Zurich's motion for preliminary equitable relief. (Docket #8).[3]

## 2. BACKGROUND

The following facts, most of which are undisputed, are drawn from the complaint and the parties' submissions. (Docket #1, #8, #9, #16, #17, #22).

### 2.1 Ripple's Employment with Zurich

Zurich is a commercial property-casualty insurance provider with its principal place of business in Illinois. One of Zurich's categories of offerings is Finance & Insurance ("F&I") products for auto dealerships. These products include vehicle service contracts, tire and wheel protections, prepaid maintenance, guaranteed asset protection, limited warranty programs, theft deterrent, paintless dent repair, environmental protection, windshield protection, and key protection.

Generally, Zurich's account executives are responsible for cultivating and growing relationships with dealerships in their territory. They also provide consulting services to dealerships and help them to maximize their profitability in the sale of add-on services after a customer purchases a vehicle from the dealership. Zurich states that it invests

---

[3] Zurich has also moved for expedited discovery. (Docket #10). The motion is unnecessary. As the Court explained to the parties at the Scheduling Conference on May 19, 2017, the Court leaves deadlines, including discovery deadlines, to be sorted out by the parties themselves. In this branch of the Court, discovery on all issues is open once the FRCP 26(f) conference is held between the parties. *See* Fed. R. Civ. P. 26(d). The motion will be denied as moot.

substantial time and resources to build and maintain goodwill and long-term relationships with dealerships across the country.

Ripple began working for Zurich in its auto dealership F&I division in July 2008. He remained at Zurich for ten years until he voluntarily resigned in January 2017. Ripple's assigned territory included five counties in Southeastern Wisconsin: Milwaukee, Ozaukee, Washington, Waukesha, and Dodge. As a function of his position as an F&I executive for Zurich, Ripple had access to "Zurich's trade secret information with respect to its product offerings, including marketing analysis, fee schedules for profit sharing with customers, and customer portfolios for those customers and prospective customers in his Territory only." (Docket #9 at 7). In addition, Ripple was entrusted with Zurich's "highly valuable customer relationships." *Id.* He was the "direct liaison between Zurich and its customers." *Id.* In Ripple's capacity as one of Zurich's national sales trainers, he had access to information regarding "Zurich's proprietary sales process, how Zurich used it to increase its dealership satisfaction, and how to use this proprietary information as an enticement to new dealerships to move their F&I business from their existing provider to Zurich." *Id.* at 4.

Ripple signed two agreements at the commencement of his employment with Zurich—an Employment Agreement and an Agreement Relating to Proprietary Information/Equipment/Work Development ("Proprietary Information Agreement"). *Id.* at 7. The Employment Agreement contains several provisions relevant to this dispute. First, in Paragraph 9, Ripple agreed that during his employment with Zurich and for five years afterward, he would keep confidential and not use or disclose, but for the benefit of the company, any "sensitive and/or

confidential information of Company." (Docket #9-4 at 3). It goes on to define sensitive and confidential information to include various things such as customer lists, business plans, and pricing strategies. *Id.* Paragraph 10 of the Employment Agreement relates to trade secrets, which are defined to include an array of things such as customer lists, premiums charged, expiration dates of policies, the company's prospect list, inspection reports, maps, rate computations, inventory reports, and etcetera. *Id.* Under this Paragraph, Ripple agreed not to disclose such "trade secrets," except to other employees or affiliates, "during or after the term of his/her employment," with no outer time limit. *Id.* Breach of Paragraph 10 entitles Zurich to an injunction restraining inference with Zurich's rights for one year following the employee's termination. *Id.* at 4. The next paragraph requires Ripple to return company documents and property to Zurich upon leaving the company. *Id.*

Finally, Paragraph 12 contains a non-solicitation provision prohibiting Ripple, for one year following termination of his employment, from soliciting policies, applications, or inquiries about insurance, or "insurance-related products or services," from any person or firm that was a customer of Zurich or its affiliates within one year prior to Ripple's termination, or, in the case of insurance policies (as opposed to insurance-related products), with whom Zurich regularly transacted business. *Id.* The restriction applies within the territory to which Ripple was assigned during the year preceding his termination. *Id.* The Employment Agreement contains a Kansas choice-of-law provision. *Id.* at 5.

The other agreement Ripple signed at the start of his employment with Zurich, the Proprietary Information Agreement, covers much of the same type of information referenced in the Employment Agreement.

(Docket #1-2 at 1). It prohibits Ripple from disclosing, during or after his employment, "proprietary information" including, for example, computer software programs, access codes, marketing and pricing information, financial data, strategic information, and etcetera. *Id.* Zurich downplays the importance of this agreement, stating that this agreement was not tailored to Ripple's work as an F&I account executive, but instead was a standard agreement that all Zurich employees are required to sign upon hire.

**2.2    Ripple's Separation from Zurich**

On January 3, 2017, Ripple gave a two-week notice of his resignation to Zurich. Ripple told Zurich he was starting his own business because his goals and ambitions no longer lined up with Zurich's model and because he was suffering effects from a serious back injury in 2013. Ripple told Zurich that his new business would focus on training and consulting for dealerships, as that was the area in which he had extensive experience. Zurich did not want to lose Ripple and made attempts at convincing him to stay, but Ripple left Zurich's employ on January 16, 2017.

After Ripple left, Zurich reviewed Ripple's business email and learned that in August 2016, months before his resignation, Ripple had already started his business, RBI LLC ("RBI"), with John Bonner, a former F&I director for EvS Auto Group, a Zurich customer. Ripple, for his part, states that although Bonner registered the name of RBI with the Wisconsin Department of Financial Institutions in August 2016, he and Bonner did not draft any organizational documents, otherwise operate RBI, or reach out to customers on RBI's behalf until after Ripple left Zurich.

Zurich also learned that, for several months prior to his departure, Ripple emailed confidential and trade secret information from Zurich to his RBI email account as well as to his and his wife's personal email accounts. Zurich states that this information "would give any competitor an immediate and substantial competitive advantage." (Docket #9 at 11).

Ripple maintains that he did not take Zurich's trade secrets or confidential information and is not using any such information to unfairly compete with Zurich. He says that he sent e-mails to his personal e-mail account because it was easier to use his personal computer to work on presentations and other projects for Zurich. Ripple states that Zurich knew he worked from home often, including during the time following his December 13, 2016 back surgery, when he worked from home exclusively. Ripple sometimes sent e-mails to his wife's account so that she could help with styling, formatting, making labels, and other similar tasks. He claims Zurich knew that his wife helped with such tasks and encouraged the practice. Finally, Ripple states that a significant number of the supposedly confidential e-mails and documents about which Zurich complains contained information that was readily available or freely shared with Zurich's customers and potential customers without confidentiality protections. For example, Ripple states that "[p]ricing and fees charged to an auto dealer are an 'open book' in this industry." (Docket #16 at 12).

At the end of January 2017, Ripple had second thoughts about his departure from Zurich and contacted Eric Hart, a Zurich executive, to inquire about the possibility of returning to Zurich in some capacity. Hart told Ripple that Ripple's position had been filled, but that Zurich would be willing to explore whether there were other opportunities available.

The two men met on February 2, 2017, at Zurich's Waukesha office to discuss Ripple's possible return to Zurich. At that meeting, "Hart confronted Ripple about his formation of his business, RBI (while still employed by Zurich) and the fact that Ripple had sent Zurich's confidential and trade secret information to his personal email accounts." (Docket #9 at 12). Zurich states that Ripple responded by saying that "the information had been destroyed and not used by him." *Id.* Ripple states that he addressed the e-mail controversy by "explain[ing] that the information was not secret or confidential, and the issue was dismissed by Zurich." (Docket #16 at 12).

On February 17, 2017, Zurich offered Ripple the position of regional manager, a significant promotion from his previous position as an account executive. Zurich provided Ripple with compensation details, and Ripple said he needed time to think over the offer and discuss it with his wife. On February 20, 2017, after not hearing from Ripple, Hart contacted Ripple, who turned down the job. Zurich states that immediately afterward, Zurich began hearing from its customers that they were receiving solicitations from Ripple on behalf of his new business.

On March 24, 2017, Zurich sent a cease and desist letter to Ripple, citing the restrictive covenants in the employments agreements Ripple signed upon his hiring at Zurich. Ripple's counsel responded by letter to Zurich on March 28, 2017, stating that Ripple believed his agreements with Zurich were not enforceable and that Ripple was entitled to engage in competitive conduct. On March 31, 2017, Ripple filed his complaint in this case, asking the Court to declare his rights and obligations under his Zurich employment agreements.

### 2.3 Harm to Zurich

Zurich claims that "[b]ased on Ripple's conduct, including his misappropriation of Zurich's trade secret information, Zurich stands to lose hundreds of thousands of dollars in business with automotive dealerships as well as losing the value of its goodwill, customer relationships, trade secrets and confidential and proprietary information[.]" (Docket #9 at 14). Zurich states that Ripple was exposed to and helped to develop information related to Zurich's customers and offerings, including "selling strategies, customer product portfolios, and competitive pricing regarding Zurich's F&I services." *Id.* Zurich states that "Ripple is now utilizing that confidential information and trading off of Zurich's customer relationships, to erode Zurich's standing in the insurance services market[,]" and that the "trade secret information and customer relationships . . . are invaluable[.]" *Id.* Zurich believes that Ripple is competing, and will to continue to attempt to compete, with Zurich with respect to the same customers with whom he had a relationship while at Zurich. *Id.*

### 3. LEGAL STANDARD

"[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quotation omitted). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008).

In the "threshold phase," the Court must determine if the movant has met its burden to establish that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* (internal citations omitted). If the party seeking a preliminary injunction fails to satisfy its obligation to demonstrate any of these elements, the Court must not grant the injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). And, only in the event that "the [C]ourt finds that the moving party has passed this initial threshold, [will] it then proceed[] to the balancing phase of the analysis." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

"In this second phase, the court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the [movant]'s injury, the likelihood of prevailing at trial, the possible injury to the [non-movant] if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). "Specifically, the [C]ourt weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the [C]ourt were to grant the requested relief." *Id.* (citing *Abbott Labs.*, 971 F.2d at 11–12). This process involves engaging in what the Court of Appeals terms "the sliding scale approach; the more likely the [movant] will succeed on the merits, the less the balance of irreparable harms need favor the [movant's] position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "[T]his balancing process should also encompass any effects that granting or denying the preliminary injunction

would have on nonparties (something courts have termed the 'public interest')." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Id.* (quoting *Lawson Prods.*, 782 F.2d at 1436).

4. **ANALYSIS**

Zurich has not made the robust showing needed to secure a preliminary injunction in this case. The Court need only discuss one of the required elements—irreparable harm—to demonstrate why Zurich's motion must be denied.

The Seventh Circuit teaches that "[o]nly if [the movant] will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction. . . . The question is [] whether the [movant] will be made whole if he prevails on the merits and is awarded damages." *Roland Mach. Co.*, 749 F.2d at 386. This is an exceedingly high burden. The movant must show not simply that obtaining money damages at judgment will be "inadequate"—he must show that they will be "seriously deficient as a remedy for the harm suffered." *Id.* Further, the Supreme Court has emphasized that a movant must do more than show a possibility that irreparable harm may occur; it must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

The movant may meet this burden by demonstrating that, absent an injunction, (1) it will become insolvent or lose its business; (2) it will be unable to finance its lawsuit; (3) it will incur damages that are very

difficult to calculate; or (4) the non-movant will become insolvent or lose its business (and thus become unable to pay any money damages). *Roland Mach. Co.*, 749 F.2d at 386. Where a movant will not incur losses so great as to threaten its solvency and where its losses will be largely economic and thus measurable and compensable, the movant does not establish irreparable harm. *Praefke Auto Elec. & Battery Inc. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cir. 2001).

Zurich has not asserted that it cannot afford to finance this lawsuit absent an injunction, or that it or Ripple will become insolvent if an injunction does not issue. Zurich's only argument bearing upon irreparable harm is that its damages will be difficult to measure. (Docket #9 at 26-27). Zurich complains that Ripple is "attempting to displace and replace Zurich" in the Wisconsin market Ripple previously serviced "by using Zurich's own confidential and trade secret information against it." *Id.* at 27. Zurich worries that, without an injunction, it will "los[e] sales and market share" and its "reputation and goodwill in the highly-competitive F&I services marketplace" will be damaged. *Id.* These harms, Zurich contends, are not the type which are readily compensable by money damages.

Zurich has not met its heavy burden of showing that it is likely to incur irreparable harm if a preliminary injunction does not issue. First, RBI has not yet secured a single customer. (Docket #16 at 26). This, of course, means that Ripple's competing business—which Zurich alleges was started in August 2016 and Ripple states was operational as of his departure from Zurich in January 2017—has not yet taken any business from Zurich, let alone enough business to seriously diminish Zurich's place in the market. This is especially true given that Ripple is only

equipped to compete with Zurich, an international commercial property-casualty company, in one discrete subsection of Zurich's overall business, F&I for auto dealerships, and in one relatively small area, Southeastern Wisconsin. Given the limited measure of documented damage to its business thus far—namely, notice from one Zurich customer, Andrew Chevrolet, that Ripple has marketed RBI's training services to it, and speculation that Ripple will solicit one other customer, Heiser—it is unlikely Zurich will suffer significant harm between now and entry of final judgment. (Docket #9-2 at 11-12); *see also Roland Mach. Co.*, 749 F.2d at 391 (court is concerned only with damages that might be incurred up to the entry of final judgment).

Although Zurich's business is one in which relationships between its representatives and clients are important in establishing goodwill that drives business, *see* (Docket #9-2 at 2-3 and #9-3 at 2-3), Zurich has not shown that Ripple's competition is likely to threaten its reputation or goodwill in any significant way before entry of final judgment. This case is unlike *BMO Harris Bank NA v. Lailer*, where the movant "provided the Court with declarations from two of [its] financial services employees that attest to their having experienced damaged, if not totally destroyed, client relationships from [the former employee's] contacts and meetings with [their] clients" and where the former employee sent e-mail solicitations attacking the reputation of her former employer. No. 16-CV-545-JPS, 2016 WL 6155997, at *8 (E.D. Wis. Oct. 21, 2016). Zurich's speculation that Ripple will attempt to lure customers away and tarnish Zurich's reputation, without more, it not enough to satisfy the Court that an injunction is necessary.

Next, Zurich's plea that a denial of its motion will "impair [its] ability to protect [its proprietary] information" is not, at this point in the litigation, supported by the record. Zurich has not put forward evidence, beyond conjecture from its executives, that Ripple is using its proprietary information in his new business. Zurich has presented evidence that Ripple sent e-mails to his personal and business accounts attaching Zurich's confidential information before he left Zurich, but it does not present evidence that Ripple retained that information and is using it for nefarious purposes. For example, although Scott Gangne, a manager at Zurich, states in his declaration that he has personal knowledge of Ripple marketing his consulting services to Zurich's customers, he does not present evidence that Ripple has shared Zurich's proprietary information with any potential customer. (Docket #9-2 at 11-13).

Finally, Zurich's untimeliness in requesting an injunction militates against granting its motion. *Ty, Inc.*, 237 F.3d at 903 ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467, 473–74 (E.D. Wis. 1986) (delay in seeking relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."). Zurich concedes that it knew about Ripple's competing business and alleged theft of Zurich's proprietary information by mid-January 2017 when Ripple resigned. Despite this knowledge, Zurich offered him a more senior position at Zurich a month later. After Ripple turned down the offer, Zurich did not file a lawsuit seeking injunctive relief. It might not have sought any relief from this Court if not for Ripple's filing of this declaratory judgment

action on March 31, 2017. Zurich then waited the full twenty-one days after service to file its answer and, along with it, its motion for a preliminary injunction. While delay alone is not sufficient to negate irreparable harm, it is an important factor in this case. Zurich's delay reassures the Court that Zurich can wait until entry of final judgment to collect any damages to which it proves it is entitled.

The outcome here is not changed by Zurich's citation to *JAK Products, Inc. v. Wiza*, in which the Seventh Circuit held that "[w]henever an employee uses his experience gained from an employer in violation of a reasonable covenant not to compete, irreparable injury occurs and injunctive relief is appropriate." 986 F.2d 1080, 1084 (7th Cir. 1993) (citing Indiana law). The *JAK Products* court relied on clear precedent from Indiana, which the parties agreed governed the dispute, *id.* at n.2, in finding that irreparable injury is assumed when the violation of a reasonable non-compete is proved. *Id.* at 1084. This precedent is not helpful for present purposes, where, although the parties disagree about which state's law governs the enforceability of the employment agreements, the only states whose laws they argue might apply are Wisconsin or Kansas, not Indiana. The *JAK Products* decision, therefore, is not sufficient to tilt the Court's analysis in Zurich's favor.

Further, the parties have not addressed whether the question of irreparable harm is a matter of substantive law, to which state law would apply, or procedural law, to which federal law would apply. *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (federal courts sitting in diversity apply state substantive law but federal procedural law under the eponymous *Erie* doctrine). In other words, although the parties present argument as to which state's law the Court should apply to construe the

employment agreements, they do not advise the Court as to which law should govern the irreparable harm analysis. Absent argument from either party on this issue, the Court elects to apply federal law. Furthermore, Zurich bore the burden to present the Court with all of the facts and arguments necessary to grant its requested relief. It failed to do so and the Court will not craft the arguments necessary to save its motion. *See Luddington v. Ind. Bell Tel. Co.,* 966 F.2d 225, 230 (7th Cir. 1992).

## 5. CONCLUSION

Zurich has not established that it faces irreparable harm from Ripple's conduct, and thus cannot prove all of the prerequisites necessary to obtain a preliminary injunction. As a result, its motion must be denied. *Abbott Labs*, 971 F.2d at 11 (if the [movant] cannot establish both likelihood of success and irreparable injury, "a court's inquiry is over and the injunction must be denied").

Accordingly,

**IT IS ORDERED** that Zurich's motion for a temporary restraining order and a preliminary injunction (Docket #8) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Zurich's motion for expedited discovery (Docket #10) be and the same is hereby **DENIED as moot.**

Dated at Milwaukee, Wisconsin, this 13th day of September, 2017.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge